*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CORNELIUS LESHAWN DENNIS,

        Defendant-Appellant.

UNPUBLISHED
October 24, 2025
10:05 AM

No. 350815
Wayne Circuit Court
LC No. 18-009923-01-FH

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CORNELIUS LESHAWN DENNIS,

        Defendant-Appellant.

No. 350824
Wayne Circuit Court
LC No. 18-009924-01-FH

Before: REDFORD, P.J., and CAMERON and PATEL, JJ.

PER CURIAM.

In these consolidated appeals, defendant appeals as of right his jury-trial convictions in Docket Nos. 350815 and 350824.[1] In Docket No. 350815, defendant appeals his convictions of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b; and

---

[1] We consolidated these appeals to advance the efficient administration of the appellate process. *People v Dennis*, unpublished order of the Court of Appeals, entered October 2, 2019 (Docket Nos. 350815 and 350824).

domestic violence, MCL 750.81(2).[2] In Docket No. 350824, defendant appeals his convictions of first-degree premeditated murder, MCL 750.316; two counts of assault with intent to commit murder (AWIM), MCL 750.83; first-degree home invasion, MCL 750.110a(2); two counts of felonious assault, MCL 750.82; and five counts of felony-firearm, MCL 750.227b. For the reasons stated in this opinion, we vacate defendant's convictions of felonious assault, but otherwise affirm in both dockets.

## I.  BASIC FACTS

These appeals arise from incidents on March 29, 2018, and September 24, 2018, for which the trial court held a consolidated trial. Defendant's convictions in Docket No. 350815 stem from a home invasion and incident of domestic violence against Jasmine Williams. Defendant had previously dated Williams and had two children with her. They separated in February 2018. On March 29, 2018, defendant took his and Williams's daughter to a daddy-daughter dance. After the dance, defendant called Williams and asked her to go out for a drink. Defendant hung up the phone after Williams declined this offer. When defendant arrived at Williams's home with their daughter, he pushed through the front door, began hitting Williams, dragged her outside, and pulled off her pajama pants. Thereafter, defendant went into the basement of the home and emerged with a firearm. He chased Williams down the street and threatened to kill her. Williams ran away from defendant, and defendant left the area.

Defendant's convictions in Docket No. 350824 stem from a home invasion in which defendant shot and killed Williams's mother, Roberta Martin, and seriously injured Williams and Williams's friend, Shavale Knighten. On September 23, 2018, defendant called Williams and Martin because he was angry about how infrequently he saw his children. During these phone calls, defendant made verbal threats to both Williams and Martin. The same day, defendant's brother and aunt called Williams to warn her to leave her home and go to a hotel room for her own safety. In the early hours of September 24, defendant broke into the home and shot Martin several times in her bedroom. Defendant then moved to Williams's bedroom and shot both Williams and Knighten while his children hid under the covers of the bed.

Following a jury trial, defendant was convicted as previously described. In Docket No. 350815, the trial court sentenced defendant to two years' imprisonment for felony-firearm and suspended defendant's sentence for domestic violence. In Docket No. 350824, the trial court sentenced defendant to imprisonment for life without eligibility for parole for first-degree murder, 13 to 20 years' imprisonment for each AWIM, 5 to 20 years' imprisonment for first-degree home invasion, 1 to 4 years' imprisonment for each felonious assault, and two years' imprisonment for each felony-firearm. In both cases, each felony-firearm conviction was to run concurrently to the other felony-firearm convictions, but consecutive to its underlying offense. This appeal follows.

---

[2] In Docket No. 350815, the jury was undecided with respect to an additional count of first-degree home invasion and acquitted defendant of an additional count of felonious assault.

## II. JUDICIAL BIAS

Defendant argues the trial court exhibited bias at the trial, which deprived defendant of his right to a fair and impartial trial. We disagree.

A defendant preserves a claim of judicial bias by raising an objection in the trial court. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). This issue is unpreserved for appellate review because defendant did not raise it in the trial court. See *id*. We review forfeited claims of judicial bias for plain error. *Id*. In most circumstances, a reversal for plain errors requires the defendant to prove that (1) an error occurred; (2) the error was plain, i.e., clear or obvious; (3) the plain error affected defendant's substantial rights; and (4) "the plain, forfeited error resulted in the conviction of an actually innocent defendant or [that] an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763-764, 774; 597 NW2d 130 (1999) (quotation marks and citation omitted; second alteration in original). However, judicial bias is a structural error. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). In the case of forfeited structural error, the error is subject to a modified plain-error analysis, in which the defendant who demonstrates plain error need not show outcome-determinative prejudice. *People v Davis*, 509 Mich 52, 73-74; 983 NW2d 325 (2022). "[T]he existence of a forfeited structural error alone satisfies the third prong of the plain-error standard." *Id*. Further, the existence of a forfeited structural error creates a formal, rebuttable presumption that the plain error seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of the defendant's innocence. *Id*. at 75.

A defendant has a constitutional right to a neutral trial judge. See *People v McDonald*, 303 Mich App 424, 437; 844 NW2d 168 (2013). There is "a heavy presumption" that the trial judge is impartial. *Jackson*, 292 Mich App at 598 (quotation marks and citation omitted). "A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 170. "A judge's conduct pierces [the] veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

Typically, a single instance of inappropriate conduct will not give an appearance of partiality; however, a single instance may be so egregious that it pierces the veil of judicial impartiality. *Id*. This Court will not evaluate errors in isolation, but will consider the cumulative effect of errors. *Id*. at 171-172. When considering the totality of the circumstances, this Court should consider a variety of factors, including:

> the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Id*. at 172.]

Every factor need not weigh in favor of a determination of impermissible partiality for a reviewing court to conclude that the judge's conduct improperly influenced the jury. *Id*.

Defendant raises a single example of alleged judicial bias. During its final instructions to the jury, the trial court explained, in relevant part:

Sometimes we accord believability based on that person's status. Sometimes, its just straight out age. Sometimes it's just straight out gender. Sometimes it's just straight out race. You know, we decide stuff a whole lot of weird kind of ways. And most of the time, it's because there's some advantage to us to believing something.

Man, you know how you smile sometimes when you're introduced to somebody and they have your name. You know, men, we do it, if we see somebody with a tie or a suit like ours, we'll say: I like your taste. Usually women, if they see their same dress, they run to different—Oh, no. My dress. You know, we have different reactions to things that we feel a penchant for.

You know, sometimes that's the way lawyers decide who to ask to be excused from the jury. If I see a prospective juror that looks like, like, like, Mr. Dennis or like somebody else, they like: Uh-uh. They, they, you know, they– Or, you know, if you look matronly, they could think: Oh. Well, that probably looks like one of their cousins or their child and they'll probably look at their child and exchange who they are.

Defendant argues that referencing defendant and using the phrase "uh oh" cast him in a negative light such that it would indicate to the jury that defendant was untrustworthy.

We start with the nature of the conduct. *Id*. Judicial misconduct may include belittling counsel, inappropriate witness questions, biased commentary in front of the jury, or improper strategic advice to one party. *Id*. at 172-173. In this case, the trial court interspersed jury instructions with anecdotes and stories to provide the jury with examples of its obligations at trial. The purpose of the quoted statement was to clarify to the jury its obligation to duly weigh the evidence before it and to assess and decide matters of credibility through reason and common sense. The trial court explained that as the fact-finder, the jury should not rely on bias or preconceived notions of the witnesses to make its decision. This commentary was consistent with the jury instruction regarding the jury's duty to judge credibility and weigh evidence. See M Crim JI 2.8. Evidently, the trial court determined it was necessary to clarify the jury's role as the fact-finder given the parties' competing theories of the case, which included differing testimony of why defendant was in the home and who fired the weapon during the incident. It was not unreasonable for the trial court to take extra time to ensure the jury understood its role to make credibility determinations and weigh the evidence before it.

For this purpose, the trial court did not make any direct comments about defendant, but used him as one of various examples of how individuals rely on bias to make decisions. In this specific example, the trial court explained that the attorneys may exhibit bias when exercising peremptory challenges to jurors. The trial court's instruction did not demonstrate the appearance of partiality or insinuate that defendant was untrustworthy. The statement was not critical of defendant, hostile toward him, or indicate incredibility toward defendant. See *Stevens*, 498 Mich at 174. Moreover, review of the trial transcripts reflect that the trial judge did not interrupt the

-4-

proceedings frequently, did not direct his conduct more toward the defense or the prosecution, and asked few questions of the witnesses. We do not find the trial court's commentary inappropriate.

Even if we assumed the trial court's commentary was inappropriate, it was a single comment in the context of a five-day trial, which included several days of witness testimony. The totality of the circumstances does not demonstrate that the trial judge harbored deep-seated antagonism against defendant. It is unlikely that the trial judge's brief statement would have biased the jury against defendant. Because the alleged instance of judicial misconduct was isolated within the trial, the court's curative instruction cured any error. See *id*. at 177. Before the jury heard any testimony, the trial court explained that its commentary and the commentary of the attorneys were not evidence. The trial court repeated this instruction during final jury instructions. Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020). Defendant has not overcome the presumption that the instructions cured most errors. See *Stevens*, 498 Mich at 177-178. No structural error occurred.

## III. DOUBLE JEOPARDY

Next, defendant argues that his convictions of AWIM and felonious assault in Docket No. 350824 violated the constitutional prohibition against double jeopardy. We agree.

To preserve a double-jeopardy issue for appellate review, a defendant must raise the issue at trial. See *People v Wilson*, 242 Mich App 350, 359-360; 619 NW2d 413 (2000). Because defendant did not object below, this issue is unpreserved. See *id*. We review unpreserved claims of constitutional error for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

Both the United States and Michigan Constitutions guard against a person being placed in jeopardy twice for the same offense. US Const, Am V; Const 1963, art 1, § 15. "The prohibition against double jeopardy provides three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004). Because defendant's convictions for AWIM and felonious assault arose "from the same conduct at the same trial, this case involves the multiple punishments strand of double jeopardy." *People v Miller*, 498 Mich 13, 17; 869 NW2d 204 (2015).

To determine whether the multiple punishments strand of double jeopardy has been violated, this Court first examines whether the Legislature clearly intended to either authorize or prohibit multiple punishments. *Id*. at 18. If multiple punishments have been specifically authorized by the statutory language, there is no violation of double jeopardy. *Id*. If multiple punishments have been specifically prohibited by the statutory language, the imposition of multiple punishments is a violation of double jeopardy. *Id*. When the legislative intent is clear, this Court is required to abide by that intent. *Id*. at 19.

The offenses at issue are AWIM and felonious assault. The elements of AWIM are "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010) (quotation marks and

citation omitted). The elements of felonious assault are "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).

In a recent order, our Supreme Court examined the language of the statutes codifying the punishments for these two offenses to discern whether their language reflected a legislative intent to either authorize or prohibit multiple punishments. *People v Gardner*, 14 NW3d 424, 425-426 (Mich, 2024).[3] The Court recognized that in order to be convicted of AWIM, the defendant must have acted "*with* intent to commit the crime of murder[.]" *Id*. at 425, quoting MCL 750.83. However, to be convicted of felonious assault, the defendant must have acted "*without* intending to commit murder." *Gardner*, 14 NW3d at 425, quoting MCL 750.82(1). Because the language of the two offenses were expressly inconsistent, the Court explained it was natural to conclude that the same person could not be punished under both offenses for the same conduct. *Gardner*, 14 NW3d at 425. Therefore, the Court concluded it violated double jeopardy to be convicted of both AWIM and felonious assault for the same assault. *Id*. at 426.

Like this case, the defendant in *Gardner* did not preserve his double-jeopardy issue for appellate review. *Id*. The Court determined the defendant overcame plain-error review. *Id*. The Court explained an error occurred, the error was plain because the Legislature expressed a clear intent in the statutory language to prohibit multiple punishments for AWIM and felonious assault arising from the same assault, and the error affected the defendant's substantial right to be protected against double jeopardy. *Id*. Finally, the Court exercised its discretion to vacate the defendant's conviction of felonious assault because the impermissible conviction and sentence for the offense seriously affected the fairness of the judicial proceedings. *Id*.

*Gardner* is dispositive in this case. Defendant was convicted of two counts of AWIM and two counts of felonious assault for the assault he committed against Williams and the assault he committed against Knighten. As explained in *Gardner*, the convictions for AWIM and felonious assault arising from the same conduct violate double jeopardy. For the reasons explained in *Gardner*, defendant has established plain error affecting substantial rights. We exercise our discretion to vacate defendant's convictions for felonious assault because the impermissible convictions and sentences for these offenses seriously affected the fairness of the judicial proceedings.

We remand this matter to the trial court to vacate defendant's convictions of felonious assault. We affirm in all other respects. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Thomas C. Cameron
/s/ Sima G. Patel

---

[3] Orders of our Supreme Court that include a decision with an understandable rationale are binding precedent for this Court. *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).